UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

M.J.,

        Plaintiff,

vs.

JEFFREY EPSTEIN and
SARAH KELLEN,

        Defendants.

_____/

## **COMPLAINT**

Plaintiff, M.J., by and through her undersigned counsel, sues the Defendants, Jeffrey Epstein and Sarah Kellen, and alleges:

1. This is an action in an amount in excess of $15,000.00, exclusive of interest and costs and is within the jurisdictional limits of this Court.

2. This Complaint is brought under a fictitious name in order to protect the identity of the Plaintiff because this Complaint makes allegations of sensitive nature of offenses against a then minor child.

3. At all times material to this cause of action, the Plaintiff, M.J. (hereinafter referred to as "Plaintiff"), was a resident of Palm Beach County, Florida.

4. At all times material to this cause of action, Defendant, Jeffrey Epstein, had a residence located at 358 El Brillo Way, West Palm Beach, Palm Beach County, Florida.

5. Defendant, Jeffrey Epstein, is currently a citizen of the United States Virgin Islands.

1

6.    At all times material to this cause of action, Defendant, Jeffrey Epstein, was an adult male born in 1953.

7.    Defendant, Sarah Kellen, is currently a citizen of New York, where she currently resides.

8.    At all times material, the Defendants Jeffrey Epstein and Sarah Kellen both owed a duty unto Plaintiff to treat her in a non-negligent manner and to not commit or conspire to commit intentional or tortious illegal acts against her.

## FACTUAL ALLEGATIONS

9.    At all times material, Defendant, Jeffrey Epstein, was an adult male, over 50 years old. Defendant Epstein is known as a billionaire, yet even those closest to him, including family members, long time employees and those that he considers his closest friends have no idea what he does or did to earn money to support his lifestyle.

10.    Defendant Epstein owns, directly or through nominee individuals used to conceal his interests, a fleet of airplanes, motor vehicles, boats and a helicopter.  He owns numerous properties and homes, including a 51,000-square-foot mansion in Manhattan, a $30 Million 7,500-acre ranch in New Mexico, a 70-acre private island formerly known as Little St. James in St. Thomas, U.S. Virgin Islands (he is alleged to have renamed this island Little St. Jeff's after himself), a mansion in London, England, a home in Paris, France, and a mansion in Palm Beach County, FL.  The allegations herein primarily concern the defendant's conduct while at his mansion in Palm Beach County, FL.

11.    Defendant Epstein has a sexual preference and obsession for underage minor females, specifically targeting female children age 12 to 17, and Defendant Epstein acts on that obsession by luring underage minor females to him where he attempts to sexually molest and batter these

underage minor females on an everyday basis, oftentimes 2 or 3 different underage minor females on one day.

12.   Sometime prior to 1998, Defendant Epstein devised a complex plan, scheme and criminal enterprise to gain access to countless underage minor females, some as young as 12 years old, for the purpose of coercing the minor females into various acts of sexual misconduct that he committed upon them.   His enterprise operated with a definite hierarchal structure with his various employees/assistants and associates, including Defendant Sarah Kellen, Jean Luc Brunel, Ghislaine Maxwell, Leslie Groff, Adriana Ross, Nadia Marcinkova, various housekeepers, butlers and pilots, performing their respective roles to ensure the goals of the enterprise: operate an organized and efficient system to maximize the number of underage minor females for Defendant Epstein (and others) to sexually abuse and exploit while avoiding law enforcement detection.

13.   Defendant Epstein, with help from his assistants and associates, recruited and procured underage minor females, lured them to one of his mansions, had the underage minor female taken to a room to be alone with him, then he would appear naked or wearing only a towel and sexually batter or otherwise sexually exploit the underage minor female.   He would then pay the underage minor female for the sex acts he committed against her (typically between $200 and $300 per molestation session, or as his criminal enterprise commonly refers to it – per "massage").   Prior to leaving, Defendant Epstein's assistant would get the phone number of the underage minor female and input it into his computer system or otherwise keep it on file.   He would then offer the underage minor female to return to his house to make money in exchange for him committing sexual acts against her, and he also typically informed her of another option - make more money recruiting and procuring other underage minor females for him to sexually

abuse.   He would tell the underage minor female that he will pay her for each underage minor female that she brings to him (again, typically between $200 and $300), and he encouraged, and oftentimes forcefully demanded, her to bring him as many underage minor females as she was able.  Through this general pitch, Defendant Epstein created a vast pyramid of underage minor females recruiting and procuring other underage minor females for his purpose of coercing these underage females into sexual acts for money.

14.   Defendants Epstein and Kellen and the criminal enterprise specifically targeted underprivileged and economically disadvantaged children to sexually exploit and molest and otherwise prey upon the vulnerabilities of these young girls.

15.   It is unknown exactly how long Defendant Epstein's aforementioned criminal enterprise operated, although information and belief indicates that it was continuously and actively in operation from at least 1998 through Defendant Epstein's criminal arrest in 2006.

16.   The complete list of underage minor females that were sexually abused by Defendant Epstein over the years is believed to have been kept on a computer system controlled by Defendant Epstein and accessible by several of his employees, including Defendant Sarah Kellen.  It is also known that much of the data regarding the names, addresses and whereabouts of each underage minor female was input by one of his assistants, including Defendant Kellen.

17.   Defendant Sarah Kellen was listed in the Federal Non-prosecution Agreement related to Defendant Epstein's criminal plea on sex charges against minors as a criminal co-conspirator for her role in the criminal activity that was committed by Defendant Epstein against many underage minor females.  She was employed by Defendant Epstein to maintain his schedule, arrange for underage minor females to be with Defendant Epstein, maintain contact with the underage minor females, schedule the underage minor females' transportation to and from Defendant Epstein's

4

mansion, and greet the underage minor female at the house before taking her upstairs to be alone with Mr. Epstein.   Upon information and belief, Defendant Kellen remains employed by Defendant Epstein and continues to work for Defendant Epstein in furtherance of the goals of the criminal enterprise.

18.   Defendant Epstein used his vast wealth and power to lure underprivileged minor females to him, and to coerce them into prostitution once he was alone with the underage minor female. He sexually battered, molested, committed lewd and lascivious acts upon and otherwise exploited numerous underage minor females and then gave them money.   So long as the underage minor female followed his demands and advances, he assumed the role of a friend or mentor or father figure to the minor female in an attempt to groom the minor female; however, if any minor female resisted his sexual advances, Defendant Epstein became frustrated, angry and threatening towards the underage minor.   His intent was to groom each minor female into engaging in sexual acts with him as well as to "work" for him, i.e. bring him other underage minor females to sexually molest, batter and exploit.   He was masterful in his exploitation and grooming of these minor females with an additional intent of gaining trust and cooperation from these minors to prevent any one of them from reporting his criminal acts to law enforcement. Certain of his many co-conspirator associates, including Ghislane Maxwell and Jean Luc Brunel, helped in this recruiting process by creating the impression that legitimate modeling opportunities were available for the minor females.

19.   Through information and belief, Defendant Epstein has been successful in luring hundreds of underage minor girls to him for the purpose of him (and sometimes others) sexually abusing them.   He intentionally preys upon underage minor females that are middle school or high school children who are not working prostitutes, and he takes pleasure in using his power

and influence to coerce these minor females into acts of prostitution with him personally and sometimes with his friends and associates as well, including but not limited to Ghislaine Maxwell and Nadia Marcinkova.

20.   Over time, Defendant Epstein fine-tuned his operation to further his goals of gaining access to a greater number and variety of underage girls while avoiding detection by law enforcement.   He also provided the roadmap for his enterprise should the illegal sexual exploitation of the enterprise be detected – he or the criminal enterprise would (and did) retain legal representation for each criminal enterprise member who would instruct each member to invoke his/her 5th amendment rights, they would hide behind the 5th amendment to avoid turning over incriminating materials (i.e. computer system that logged information about the underage sexual molestation victims, scheduling books, message pads, and tangible items such as vibrators and dildos), they would destroy evidence and refuse all cooperation with law enforcement.

21.   The plan and scheme was developed by Defendant Epstein, and he and his assistants and associates carried it out with each underage minor female in a well-planned and ritualistic manner; Epstein ran this criminal enterprise as an experienced Mob boss would run any organized crime family – in a well-planned, organized, arrogant and ruthless manner, with complete cooperation from his co-conspirator associates and underlings and an absolute dedication to carrying out the illegal operations of the criminal enterprise.

22.   Defendant Epstein frequently traveled between his various mansions and either he or an authorized agent would call to inform a recruiter, assistant, or scheduler at his next destination as to his arrival time.   His scheduler, usually Defendant Sarah Kellen, would then contact an underage minor female and schedule her to be at Defendant Epstein's mansion or to bring another underage minor female to his mansion at a particular time.   Once the minor female was

6

brought to Defendant Epstein's residence, she was greeted at the door of the mansion and lead inside by one of Defendant Epstein's employees, oftentimes Defendant Sarah Kellen.

23.   Defendant Sarah Kellen would lead the underage minor female up to Defendant Epstein's room and leave the underage minor alone in the room. Defendant, Jeffrey Epstein, himself would then appear naked or wearing only a towel.  He would then demand a massage and during the massage he would attempt, usually successfully, to perform one or more lewd, lascivious, and sexual acts, including, but not limited to, masturbation, touching of the underage minor female's sexual organs, coercing or forcing the underage minor female to perform sex acts with him, using vibrators or sexual toys on the underage minor female, coercing the underage minor female into sexual intercourse with himself or others, and digitally penetrating the underage minor female.  He would then give the Plaintiff money for engaging in this sexual activity.

24.   Consistent with Defendants Epstein and Kellen's foregoing scheme or plan, in or around the summer of 2002, Plaintiff, an economically poor and vulnerable child, was told by another one of Epstein's underage minor sex abuse victims, that she could make $300 cash by giving an old man a massage on Palm Beach.

25.   Plaintiff's then minor acquaintance (also a sexual abuse victim of Epstein) telephoned Defendant Epstein and scheduled for Plaintiff to go to Defendant Epstein's house to give him a massage.  During that call, Defendant Epstein himself got on the phone and spoke with Plaintiff MJ and asked her personally to come to his mansion in Palm Beach.

26.   Plaintiff then took a taxicab to Defendant Epstein's mansion and was greeted by Epstein's top assistant, Defendant Sarah Kellen.

27.   Defendant Kellen, in furtherance of the scheme to exploit Plaintiff, escorted Plaintiff upstairs to Defendant Jeffrey Epstein's large bathroom, where Defendant Kellen set up the

massage table and showed Plaintiff different massage lotions to use.  Defendant Kellen then left Plaintiff alone in the room. Plaintiff was alone in Defendant Epstein's bathroom until Defendant Jeffrey Epstein emerged wearing only a towel.

28.   Defendant Epstein then walked to the massage table that was already open in the room. He lied face down on the table and told Plaintiff to start massaging him, at which time he engaged in a conversation with Plaintiff.   During the conversation, Defendant Epstein asked Plaintiff her age and she told him she had recently turned 16.

29.   Consistent with all of Defendant Epstein's known underage minor female victims, Plaintiff had no massage experience whatsoever and she informed him of that, and Defendant Epstein began instructing Plaintiff on how he liked his massage.

30.   After approximately 15 minutes, Defendant Epstein turned over onto his back, and he commanded Plaintiff to massage his chest.

31.   Defendant Epstein then suddenly removed his towel and his penis was already erect.  He then commanded Plaintiff to remove her shirt and bra and to begin "pinching his nipples" as he began masturbating with his right hand.

32.   As he was masturbating, Defendant Epstein began fondling Plaintiff's breasts.

33.   Defendant Jeffrey Epstein, while masturbating with his right hand, reached out his left hand and grabbed Plaintiff's vagina and butt over her clothes.  Plaintiff pushed Defendant's hand away and told him repeatedly not to touch her like that.  Epstein was persistent in his attempt to grab Plaintiff's vagina and continued to grab her vagina and butt on multiple occasions after she told him not to.

34.   Defendant Epstein continued to masturbate his exposed penis until he ejaculated in front of the then minor Plaintiff.

8

35.   Plaintiff was shocked and embarrassed by the events and Defendant Epstein talked to her to persuade her that everything he was doing with he was normal.

36.   Epstein paid Plaintiff $300 for allowing him to grope her and masturbate in her presence.

37.   Plaintiff returned to Epstein's home on approximately 20 occasions.  On each occasion Epstein grabbed Plaintiff's bare breasts, exposed his penis, masturbated and ejaculated in Plaintiff's presence, and paid her $300 each time.

38.   Defendant Epstein coerced Plaintiff into acts of prostitution, preying on her low economic status and troubled upbringing, complimenting Plaintiff for being "special" to him and having a "very pretty body" and making promises to Plaintiff such as – he told Plaintiff that if she graduated high school, then he would buy her a computer, something that she wanted yet could not afford.

39.   On multiple occasions Defendant Epstein pressured Plaintiff to bring him other underage minor females to abuse; he told Plaintiff that he would pay her $300 for each girl she brought him, but Plaintiff refused to bring other girls.

40.   Defendant Epstein told Plaintiff that he would pay her more money if she would give him oral sex and that he would pay her $600 for actual sexual intercourse.  Plaintiff refused.

41.   Defendant Epstein personally called Plaintiff at least five times to tell her when she should be at his house to "work" or give him a "massage" (Epstein's criminal enterprise's learned code words for paying minors for Epstein and others to interact with them sexually).

42.   Every other time (approximately 15) Defendant Kellen called to inform Plaintiff of the date and time when she needed and was expected to be at Epstein's mansion to "work".

43.   The acts referenced above, committed by Defendant, Jeffrey Epstein, against the then minor Plaintiff were committed in violation of numerous State and Federal criminal statutes

condemning battery, assault and the exploitation of minor children, contributing to the delinquency of a minor and other crimes, specifically including, but not limited to, those criminal offenses outlined in Chapters 796, 800, and 827 of the Florida Statutes, as well as those designated in Florida Statutes §796.03, §796.07, §796.045, §796.04, §796.09, §39.01, §450.151, and §827.04.

44.   The above-described acts took place in Palm Beach County, Florida at the residence of the Defendant, Jeffrey Epstein.  Any assertions by Defendants, Jeffrey Epstein and Sarah Kellen, that they were unaware of the age of the then minor Plaintiff are belied by their actions and rendered irrelevant by the provisions of applicable Florida Statutes concerning the sexual exploitation and abuse of a minor child.  The Defendants, Jeffrey Epstein and Sarah Kellen, at all times material to this cause of action, knew and should have known of the Plaintiff's minority as Plaintiff specifically told Epstein her age and Defendant Epstein and criminal organization has a history of seeking out underage minor children to sexually abuse.  In fact, one primary goal of the organization is to sexually abuse females who are under the age of 18, and oftentimes Defendant Epstein has turned away females (i.e. refused to engage in sexual acts with them) for being "too old" once she reaches 18 years of age, and he has reprimanded girls for bringing him other girls who are over the age of majority.

45.   In June 2008, in the Fifteenth Judicial Circuit in Palm Beach County, Florida, Defendant Epstein entered pleas of "guilty" to various Florida State crimes related to his exploitation of minors for sex.

46.   As a condition of that plea and in exchange for the Federal Government entering into a Non-Prosecution Agreement with Defendant Epstein, wherein the Federal Government agreed to effectively stay any prosecution of Jeffrey Epstein, Sarah Kellen and other criminal co-

conspirators Nadia Marcinkova and Leslie Groff, Defendant Epstein agreed to admit that approximately 40 underage minor females, whose names were provided to Defendant Epstein, were his victims.  Plaintiff was not included in that list as she moved away from the West Palm Beach area in part to escape from Epstein, and she has lived in fear of Epstein and his organization and has not yet been contacted by law enforcement.

47.   Beginning in or about June 2008 and continuing to the present time, defendant Epstein has been aware he faces significant financial liability for his sexual offenses, both to MJ and to many other similarly-situated girls whom he abused.  MJ and these other girls are creditors of Epstein, in that have filed and can file tort actions against him under both Florida and Federal laws.  Accordingly, Epstein has conveyed substantial assets and property into the names of other persons and into overseas bank accounts and other financial institutions.   These assets and properties could have been attachable and used to pay the debts owed to MJ and to the other girls that Epstein has abused.

48.  As an example of the fraudulent conveyances that Epstein has attempted, in approximately October 2009, Epstein placed his personal 727 aircraft up for sale, with the intent that the proceeds of that sale would be hidden so that MJ and other creditors of Epstein would not be able to secure payment from that substantial asset.

49.   While Epstein is clearly distinct from the criminal enterprise that he oversees that asset, as well as his other airplanes and helicopters and other assets, have been used continuously and repeatedly to further the interest and endeavors of Epstein and his criminal enterprise.

50.   As another example of the fraudulent transfers that Epstein has made, Epstein has titled a Ford F-150 Truck in the name of Larry Visoki (Epstein's personal pilot).  Visoski was unaware that the truck was titled in his name when he was questioned under oath in a deposition.

51.   In approximately 2009, Defendant Epstein purchased a $68,000 Land Rover and registered it in Visoski's name with the intent to hide this asset from MJ and other creditors.

52.   In approximately 2009, Defendant Epstein purchased a Mercedes-Benz 2005 by wiring funds to Visoski and then placing the car in Visoski's name.

53.   In approximately 2009, Defendant Epstein bought a Jaguar X-Type 2005 so that he (Epstein) would have another car around Palm Beach available for his friends to use and then placed the car in Visoski's name.

54.   In approximately September 2009, Visoski attempted to sell a Ferrari owned by Epstein for $159,000.  Epstein intended for the sale to hide the value of this Ferrari and prevent MJ and other creditors from recovering from him.

55.    Epstein is concealing substantial assets through a new corporation, Shmitka Air, Inc., whose representative is Larry Visoski.   In September 2010, Epstein attempted to sell a 1999 Bell Helicopter for approximately $1,900,000.   This sale was an attempt to prevent MJ and other creditors from recovering from him.

56.   Epstein is also concealing substantial assets through an entity known at JEGE, Inc.  He is currently attempting to sell an aircraft for $10,000,000 through that entity in an attempt to prevent MJ and other creditors from recovering from him.

57.   Through information and belief, Epstein and/or his criminal enterprise provides the financial support for his various employees, co-conspirators, other criminal enterprise members and associates.

58.   In addition to Epstein's various houses, he owns or controls other condominiums, including approximately 8 to 10 units at 301 East 66 Street, in New York City, where certain of his or his Criminal Enterprise associates live or reside, including Jean Luc Brunel, Nadia

Marcinkova, Sarah Kellen, and at times various underage minor girls are stashed at this location as well.

59.   Defendant Epstein has numerous overseas contacts and accounts and sophistication in international business transactions.  He previously served as a trader at Bear Stearns and founded his own financial management firm, J. Epstein and Col. (later called Financial Trust Co.) located on his private island in the U.S. Virgin Islands where, until his recent incarceration, according to him he allegedly managed the assets of billionaire clients.

60.   After extensive investigation into Epstein's employment history, including questioning of Epstein's family, those whom Epstein considers friends and longtime employees of Epstein, the only known client of Epstein was Limited, Inc. Founder Leslie Wexner, although it is believed that even that relationship has been severed.  No other legitimate means of income have been reported.

## COUNT I

## BATTERY AGAINST DEFENDANT EPSTEIN

61.   Plaintiff M.J. adopts and realleges paragraphs 1 through 60 above.

62.   In the summer of 2002, just after Plaintiff turned 16 years old, Defendant Epstein committed battery against Plaintiff when he intentionally touched intimate areas of her body and person in an offensive manner while she was a minor child.

63.   Defendant Epstein intentionally touched Plaintiff MJ's private areas multiple times against the will of MJ.

64.   Defendant Epstein's tortious commission of battery upon Plaintiff was done willfully.

65.   As a direct and proximate result of the offenses committed by Defendant Epstein against the then minor Plaintiff, MJ, she has in the past suffered and will in the future suffer injury, pain

and suffering, emotional distress, psychological and psychiatric trauma, mental anguish, humiliation, confusion, embarrassment, loss of self-esteem, loss of dignity, loss of enjoyment of life, invasion of her privacy and other damages associated with Defendant's manipulation and leading her into a perverse and unhealthy way of life. Plaintiff will incur medical and psychological expenses. Plaintiff has suffered a loss of income, a loss of the capacity to earn income in the future, and loss of proper and complete education. These injuries are permanent in nature and Plaintiff MJ will continue to suffer these losses in the future.

WHEREFORE, Plaintiff MJ demands judgment against Defendant Epstein for compensatory damages, punitive damages and such other relief as this Court deems proper and hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANT EPSTEIN

66. The Plaintiff adopts and realleges paragraphs 1 through 60 above.

67. Defendant Epstein's extreme and outrageous conduct towards the then minor Plaintiff was intentional and reckless.

68. Defendant Epstein acted with the intent to cause severe emotional distress or with reckless disregard for the high probability of causing severe emotional distress.

69. As a direct and proximate result of the offenses committed by Defendant Epstein against the then minor Plaintiff, MJ, she has in the past suffered and will in the future suffer injury, pain and suffering, emotional distress, psychological and psychiatric trauma, mental anguish, humiliation, confusion, embarrassment, loss of self-esteem, loss of dignity, loss of enjoyment of life, invasion of her privacy and other damages associated with Defendant's manipulation and leading her into a perverse and unhealthy way of life. Plaintiff will incur medical and

psychological expenses.  Plaintiff has suffered a loss of income, a loss of the capacity to earn income in the future, loss of proper and complete education. These injuries are permanent in nature and Plaintiff MJ will continue to suffer these losses in the future.

WHEREFORE, Plaintiff M.J. demands judgment against Defendant Epstein for compensatory damages, punitive damages and such other relief as this Court deems proper and hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT III
## CONSPIRACY TO COMMIT TORTIOUS ASSAULT OR BATTERY AGAINST DEFENDANT SARAH KELLEN

70.   The Plaintiff adopts and realleges paragraphs 1 through 60 above.

71.   Defendant Kellen is one of Defendant Epstein's top assistants, as referenced previously in this Complaint.  Defendant Epstein, Defendant Kellen and others reached an agreement amongst and between them and otherwise conspired for the purpose of allowing Defendant Epstein and others to commit the tortious and illegal acts described above against Plaintiff MJ.

72.   Defendant Kellen aided, abetted and assisted Defendant Epstein in his organized scheme and plan to sexually exploit Plaintiff and commit battery against her and/or commit or attempt to commit numerous other crimes against her, including coercing her into prostitution.

73.   Defendant Kellen conspired with Defendant Epstein to commit tortious and illegal conduct against Plaintiff, and in furtherance of the conspiracy Kellen specifically engaged in overt acts such as contacting Plaintiff MJ on many occasions, scheduling the then minor Plaintiff's appointment for a "massage" knowing that Defendant Epstein was going to commit battery against Plaintiff, attempt sexual battery against Plaintiff, and force her into prostitution and otherwise did everything in her ability to conceal the illegal operation and refuse cooperation with law enforcement.

74.   Additionally, Defendant Kellen greeted Plaintiff on the occasions when Plaintiff arrived at Epstein's home and personally lead Plaintiff to Defendant Epstein's bathroom where Epstein appeared for the purposes of committing crimes against Plaintiff.

75.   Defendant Epstein's battery against Plaintiff was facilitated by Defendant Kellen and the conspiracy resulted in the various aforementioned crimes being committed against Plaintiff MJ as well as many other underage minor females.

76.   As a direct and proximate result of Defendant, Sarah Kellen's, participation in the aforementioned conspiracy, Plaintiff, MJ, she has in the past suffered and will in the future suffer injury, pain and suffering, emotional distress, psychological and psychiatric trauma, mental anguish, humiliation, confusion, embarrassment, loss of self-esteem, loss of dignity, loss of enjoyment of life, invasion of her privacy and other damages associated with Defendant's manipulation and leading her into a perverse and unhealthy way of life.   Plaintiff will incur medical and psychological expenses.   Plaintiff has suffered a loss of income, a loss of the capacity to earn income in the future, loss of proper and complete education. These injuries are permanent in nature and Plaintiff MJ will continue to suffer these losses in the future.

WHEREFORE, Plaintiff MJ demands judgment against Defendant Sarah Kellen for compensatory damages, punitive damages and such other relief as this Court deems proper and hereby demands trial by jury on all issues triable as of right by a jury.

### COUNTS  IV THROUGH XXIII
### CAUSES OF ACTION AGAINST DEFENDANTS EPSTEIN AND KELLEN PURSUANT TO 18 USC §2255 IN VIOLATION OF VARIOUS ENUMERATED OFFENSES CONTAINED WITHIN THAT FEDERAL STATUTE

77.   Plaintiff, MJ, adopts and realleges paragraphs 1 through 60 above.

78.   The allegations contained herein in Counts IV through XXIII are separate and distinct legal remedies.

16

79. As a condition of Defendant, Jeffrey Epstein's criminal plea, and in exchange for the Federal Government not prosecuting the Defendant for numerous federal offenses, the Defendant, Jeffrey Epstein, entered into a Non-Prosecution Agreement with the Federal Government; that agreement governed not only Defendant Epstein's conduct but also the conduct of his "co-conspirators" including Defendant Kellen as she played an essential and criminal role in the commission of these offenses.

80. The Plaintiff, MJ, was in fact a victim of one or more offenses enumerated in Title 18, United States Code, Section 2255, and as such asserts a cause of action against the Defendant, Jeffrey Epstein, and against Defendant Kellen pursuant to this Section of the United States Code and the agreement between the Defendant, Jeffrey Epstein, and the United States Government.

81. Specifically, Defendants Epstein and Kellen:

> (a) knowingly conspired with others known and unknown to use a facility or means of interstate commerce to knowingly persuade, induce, or entice minor females, including Plaintiff MJ, to engage in prostitution, in violation of title 18, United States Code, Section 2422(b).

> (b) knowingly and willfully conspired with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct with minors, including Plaintiff MJ, as defined in 18 U.S.C. § 2423(f), with minor females, in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code, Section 2423(e);

> (c) used a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females, including Plaintiff MJ, to engage in prostitution; in violation of Title 18, United States Code, Section 2422(b);

(d) traveled in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females, including Plaintiff MJ; in violation of Title 18, United States Code, Section 2423(b).

82.   As a direct and proximate result of the aforementioned criminal offenses enumerated in Title 18, United States Code, Section 2255, being committed against the then minor Plaintiff, Plaintiff, MJ, she has in the past suffered and will in the future suffer injury, pain and suffering, emotional distress, psychological and psychiatric trauma, mental anguish, humiliation, confusion, embarrassment, loss of self-esteem, loss of dignity, loss of enjoyment of life, invasion of her privacy and other damages associated with Defendant's manipulation and leading her into a perverse and unhealthy way of life.   Plaintiff will incur medical and psychological expenses. These injuries are permanent in nature and Plaintiff MJ will continue to suffer these losses in the future.   Plaintiff, M.J., has also incurred attorneys' fees.

83.   With regard to each of the following counts, Plaintiff suffered personal injury, as outlined above from the acts above, as a result of the violations of federal criminal law by Defendant Epstein enumerated in paragraph 33, on approximately 20 occasions, and while the dates are not all precisely documented or diaried by Plaintiff, Defendants Epstein and Kellen committed these crimes and inflicted said injuries on or about the following dates:

| | |
|---|---|
| COUNT IV | August 2002 |
| COUNT V | September 2002 |
| COUNT VI | October 2002 |
| COUNT VII | November 2002 |
| COUNT VIII | December 2002 |
| COUNT IX | January 2003 |

| COUNT X | February 2003 |
| COUNT XI | March 2003 |
| COUNT XII | April 2003 |
| COUNT XIII | May 2003 |
| COUNT XIV | June 2003 |
| COUNT XV | July 2003 |
| COUNT XVI | August 2003 |
| COUNT XVII | September 2003 |
| COUNT XVIII | October 2003 |
| COUNT XIX | November 2003 |
| COUNT XX | December 2003 |
| COUNT XXI | January 2004 |
| COUNT XXII | February 2004 |
| COUNT XXIII | March 2004 |

WHEREFORE, with regard to each and every one of these counts, Plaintiff, MJ, demands judgment against Defendant, Jeffrey Epstein, for compensatory damages, loss of income, a loss of the capacity to earn income in the future, attorney's fees, and such other and further relief as this Court deems just and proper, and hereby demands trial by jury on all issues triable as of right by a jury.

**COUNT XXIV**
**Civil Remedy for Criminal Practices**

84.   Plaintiff realleges paragraphs 1 through 60 above and for the purposes of this count incorporates and alleges the RICO Statement that has been filed contemporaneously herewith as Exhibit "A."

19

85.   The allegations contained herein in Count XXIV are a separate and distinct legal remedy brought pursuant to Florida Statute 772.104(1) and (2).

86.   Defendant, Jeffrey Epstein, was associated with an enterprise, a group of individuals associated in fact although not a legal entity, which was comprised of at least Defendant Jeffrey Epstein, Sarah Kellen, Leslie Groff, Jean Luc Brunel, Ghislaine Maxwell, and Nadia Marcinkova (and likely many other yet unknown persons); Defendant Epstein participated in this enterprise, or conspired or endeavored to so participate, through a pattern of criminal activity in violation of Florida Statutes §772.103(3)-(4), as further outlined in detail in the RICO statement filed with this court.

87.   This enterprise was separate and distinct from Epstein himself and had a definite hierarchical structure.  Epstein served informally but effectively as the leader, C.E.O, or "boss" of this organization similar to the way an experienced mob boss runs his organized crime family, directing his underlings how to recruit and procure underage girls for his sexual activities and the sexual activities of others, developing the use of slang or code words to be used to discuss the illegal activities of the organization, designing a plan or scheme to gain the cooperation of underage minor females, developing methods and techniques to otherwise avoid detection from law enforcement including making large charitable donations to law enforcement agencies, powerful politicians, businessmen and world leaders, associating with powerful social people and highly influential politicians and attorneys, gathering information to blackmail or extort powerful people, devising a plan to attack the credibility and character of anyone that dare unveil the illegal operations of the enterprise and to take an oath to remain silent and/or lie when confronted by law enforcement about the illegal operations and activities of the criminal organization.   Epstein's key "lieutenant" in the local Palm Beach branch of the National

organization was Kellen, who served as both his scheduler and a recruiter/procurer of the girls. Marcinkova also served as a recruiter and helped Epstein satisfy his criminal sexual desires by, on occasion, directly participating in sexual abuse and prostitution of the minor girls. Epstein also used otherwise-legitimate business activities to help further the purpose of the criminal enterprise. These apparently legitimate activities provided "cover" for Epstein and his associates to commit the crimes. Epstein and his associates maintained the appearance of running an upstanding investment business, as well as other legitimate businesses with connections to modeling agencies and other powerful business and political people, to discourage the minor girls from reporting the abuse to law enforcement. Ghislane Maxwell and Jean Luc Brunel helped to provide "cover" by creating the impression that legitimate modeling opportunities were available for the girls. There are many other known and unknown associates of the criminal organization, that worked throughout the country and possibly internationally, who performed functions to perpetuate the criminal activities of the organization.

88.  Defendant Jeffrey Epstein participated in this enterprise through a pattern of criminal activity in that he engaged in at least two incidents of criminal activity, as defined and required in Florida Statute 772.102 and as described below, that have the same or similar intents, results, accomplices, victims, or methods of commission and are not isolated incidents.

89.  Defendant Jeffrey Epstein engaged in criminal activity by committing, attempting to commit, conspiring to commit or soliciting, coercing or intimidating another person to commit one or more of the following predicate acts as outlined and defined in Florida Statute 772.102:

>    (a)    Procuring for prostitution, or causing to be prostituted, any person who is under the age of 18 years in violation of Florida Statutes Chapter 796.03;

>    (b)    Acts of battery in violation of Florida Statutes Chapter 784;

(c)     Forcing, compelling or coercing another to become a prostitute in violation of Florida Statutes Chapter 796.04;

(d)     knowingly recruiting, enticing, harboring, transporting, providing or otherwise obtaining by any means a person, knowing that coercion would be used to cause that person to engage in prostitution in violation of Florida Statutes Chapter 796.045;

(e)     tampering with a witness in violation of Florida Statutes Chapter 914.22;

(f)     altering, destroying, removing, or concealing records or documents or other evidence with the purpose to impair its verity or availability in violation of Florida Statutes Chapter 918.13;

(g)     maintaining a place (or more accurately "places") for the purpose of lewdness or prostitution; offering or securing another for the purpose of prostitution or for some other lewd or indecent act; receiving persons into his Palm Beach mansion for the purpose of prostitution or lewdness; directing, taking or transporting or agreeing to direct take or transport persons to his Palm Beach mansion with knowledge or reasonable belief that the purpose of such directing, taking or transporting was prostitution or lewdness; all in violation of Florida Statutes Chapter 796.07.

90.  The criminal acts of Defendant Epstein occurred repeatedly over a substantial period of time and were not isolated events.

91.  Under Defendant, Jeffrey Epstein's plan, scheme, and enterprise, Defendant, Jeffrey Epstein, paid employees and underlings, including but not limited to Sarah Kellen, to bring him minor girls to his Palm Beach mansion in order for the Defendant to solicit, induce, coerce, entice, compel or force such girls to engage in acts of prostitution and sexual misconduct with

22

Defendant Epstein and sometimes Nadia Marcinkova, and to otherwise commit acts of sexual battery thereon, and further Defendant Epstein worked in concert as part of the enterprise with those who were free to act independently and advance their own interests, including Ghislaine Maxwell and Jean Luc Brunel, to obtain minor girls for sexual purposes.

92.   Plaintiff, MJ, was the victim of Defendant, Jeffrey Epstein's plan, scheme, and enterprise and was so injured by reason of his violations of the provisions of s. 772.104.  Plaintiff, MJ, was called on the telephone by Defendant Epstein and other employees of his, including Sarah Kellen, and transported to the Defendant, Jeffrey Epstein's residence, where she was placed in a room along with the Defendant, enticed to commit acts of prostitution, and had acts of sexual battery and sexual exploitation committed against her. Defendant, Jeffrey Epstein, conspired with his assistants and employees in order to accomplish their common motive or intent of seeking out, gaining access to, and exploiting minor children such as the Plaintiff, MJ, in the aforementioned ways, and he further conspired with his employees, assistants and underlings to ensure that the crimes of this criminal enterprise were concealed or undetected by law enforcement.   Those who were free to act independently and advance their own interests, including Ghislaine Maxwell and Jean Luc Brunel, also worked with the enterprise to conceal the activities of the enterprise.

93.   After law enforcement began to detect the criminal activities of Defendant Epstein and the other persons involved in the criminal enterprise, the enterprise used resources and information to conceal the illegal activities of the enterprise, threaten the victims of the crimes of the enterprise if they revealed the scope of the enterprise to law enforcement, and concealed or destroyed documents relevant to the prosecution of the various members of the enterprise.  The enterprise also made various efforts to discourage the victims from cooperating with law

enforcement and from filing civil lawsuits to vindicate their rights. Epstein and other members of the enterprise made cash payments and gave gifts to the victims of the enterprise in order to discourage them from reporting crimes to law enforcement and other authorities.

94. Through information and belief, this criminal enterprise gained valuable consideration from the practice of sex-trafficking underage children and providing underage children to other adults and otherwise derived valuable consideration for running a national and oftentimes international sex-trafficking and underage prostitution ring, typically by coercing and introducing the economically disadvantaged underage minor females into prostitution and sometimes into being underage sex slaves for the enterprise.

95. The evidence clearly and convincingly establishes that Plaintiff MJ was injured by reason of violations of the provisions of 772.103, and as such is entitled to threefold the actual damages sustained and a minimum of $200, and reasonable attorney's fees and court costs.

96. In the alternative, and pursuant to s. 772.104, Plaintiff MJ was injured due to sex trafficking committed in violation of s. 772.103 and is thus entitled to threefold the amount gained from the sex trafficking and to a minimum amount of damages not less than $200, reasonable attorney's fees and court costs.

97. Plaintiff has suffered a loss of income, a loss of the capacity to earn income in the future, loss to her property and business opportunities and other losses.

WHEREFORE, under the provisions of Florida Statutes Chapter 772, Plaintiff, MJ, demands judgment against Defendant, Jeffrey Epstein, for any minimum damages authorized by law, all actual damages sustained (to be trebled as authorized by law), court costs and attorneys' fees, and such other and further relief as this Court deems just and proper, and hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT XXV

### Cause of Action Pursuant to Florida Statute 796.09
### Against Defendant, Jeffrey Epstein

98. Plaintiff adopts and realleges paragraphs 1 through 60 above.

99. The allegations contained herein in Count XXV are a separate and distinct legal remedy.

100. Defendant, Jeffrey Epstein, was a wealthy and powerful man, and Plaintiff was an economically disadvantaged and impressionable minor.

101. Plaintiff MJ had never engaged in any act of prostitution prior to meeting Epstein or being introduced to any of the members of the criminal enterprise of which Defendant Epstein was an operating member and leader.

102. Defendant, Jeffrey Epstein, used his vast wealth and power to coerce Plaintiff into prostitution and/or coerced her to remain in prostitution.

103. Defendant, Jeffrey Epstein, coerced Plaintiff into prostitution in one or more of the following ways:

      A.    Domination of her mind and body through exploitive techniques;

      B.    Inducement;

      C.    Promise of greater financial rewards;

      D.    Exploitation of a condition of developmental disability, cognitive limitation, affective disorder, and/or substance dependency;

      E.    Exploitation of human needs for food, shelter or affection;

      F.    Exploitation of underprivileged and vulnerable economic condition or situation;

      G.    Use of a system of recruiting other similarly situated minor girls to further coerce and induce Plaintiff into the lifestyle of prostitution; and

H.      Exploitation through demonstration of abundant wealth and power to impress a young and vulnerable then minor Plaintiff and to coerce her into prostitution.

104.  As a direct and proximate result of the offenses committed by Defendant, Jeffrey Epstein, against Plaintiff pursuant to Florida Statutes §796.09, the Plaintiff has in the past suffered, and will in the future suffer, injury, pain and suffering, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and other damages associated with Defendant, Jeffrey Epstein, controlling, manipulating and coercing her into a perverse and unconventional way of life for a minor.  The then minor Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses.  Plaintiff has suffered a loss of income, a loss of the capacity to earn income in the future, and a loss of the capacity to enjoy life.  These injuries are permanent in nature and the Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff, Jane Doe, demands judgment against the Defendant, Jeffrey Epstein, for compensatory damages, punitive damages as specifically allowed by this and other statutes and by law, attorney's fees, and such other and further relief as this Court deems just and proper, and hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT XXV

### Cause of Action Pursuant to Florida Statute 726.101
### Against Defendant, Jeffrey Epstein

105.  This count alleges an action for redress of fraudulent transfers brought under Florida's Uniform Fraudulent Transfer Act, sections 726.101, et seq., Fla.Stats. ("FUFTA").

106.  Plaintiff adopts and realleges paragraphs 1 through 60 above.

107.  M.J. is a creditor of defendant Jeffrey Epstein.  She has various claims against him for repeated sexual molestation of her when she was a minor, as alleged in the other counts of this complaint.

108.  Given the egregious acts of sexual molestation the defendant perpetrated against her, M.J. has a claim against defendant, once punitive damages are added, is worth in excess of $50,000,000.  Therefore, he is facing judgments in excess of $50,000,000 from her.  Epstein is thus a debtor of M.J., as defined in the FUFTA.

109.  Defendant Jeffrey Epstein has numerous overseas contacts and sophistication in international business transactions.  He previously served as a trader at Bear Stearns and founded his own financial management firm, J. Epstein and Col. (later called Financial Trust Co.) located on his private island in the U.S. Virgin Islands where, until his recent incarceration, he managed the assets of billionaire clients.

110.  Defendant Jeffrey Epstein has transferred, is transferring, and intends to transfer in the near future his assets, to locations overseas and elsewhere and/or to nominee individuals who conceal Epstein's interest in the assets, with the actual intent to hinder, delay and defraud M.J. To prevent M.J. from satisfying any judgment that she might obtain in her pending lawsuit again him, Epstein has moved and intends to move his significant financial assets to locations overseas (i.e., to Israel) or in other unreachable areas and to title his assets (including real property, aircraft, boats, vehicles, and financial instruments) in the names of other persons or entities, even though he maintains (directly or indirectly) control over those assets.   These transfers are designed by Epstein to prevent M.J. from being able to collect on any judgment she might obtain against him, including any punitive damages judgment.

111.  In recent lawsuits against him very similar to those filed by M.J., defendant Epstein has refused to answer and taken the Fifth when asked whether he intends to conceal assets from those with claims against him.

112.  In recent lawsuits against him very similar to those filed by M.J., defendant Epstein refused to answer and took the Fifth Amendment when asked whether he intends to remain in the country in the future.

113.  Epstein could currently post a $15 million bond to satisfy a judgment in this case without financial or other difficulty.

WHEREFORE plaintiff M.J. demands judgment against defendant Epstein as follows:

(a)  An accounting by defendant Jeffrey Epstein of all of his significant financial assets, whether held in this country or overseas, and all significant transfer of assets in the last three years;

(b) Avoidance of the fraudulent transfers or obligations to the extent necessary to satisfy M.J.'s claims;

(c) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with applicable law;

(d) An injunction against defendant Jeffrey Epstein and such transferees as may be appropriate, or both, against further transfers of any assets pending further order of the Court and posting of a bond to protect M.J.;

(e) Appointment of a receiver to take charge of the assets of defendant Jeffrey Epstein until the Court is satisfied that M.J. interests in having assets available from the defendant to satisfy any judgment are fully protected;

28

(f) Posting by defendant Jeffrey Epstein of a $15,000,000 bond to satisfy any judgment obtained by M.J.. in her pending lawsuits; and

(g) All other relief that the circumstances may require to protect M.J. and her ability to satisfy any judgment she might obtain.

Plaintiff also demands a jury trial on all issues so triable by jury.

Dated: _Sept. 17, 2010_

Respectfully submitted,

FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, PL
Attorneys for Plaintiff(s)
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Fl 33301
(954)524-2820 TELEPHONE
(954)524-2822 Fax
brad@pathtojustice.com

BY:

Bradley J. Edwards
Florida Bar No. 542075